## BRINKER v. FIRST NAT. BANK OF CLEVELAND. (No. 7345.)

Court of Civil Appeals of Texas. Austin.
March 20, 1929.

Rehearing Denied April 17, 1929.

Geo. K. Holland, of Dallas, for appellant.

Robert G. Payne and Robertson, Robertson & Gannon, all of Dallas, for appellee.

McCLENDON, C. J. March 1, 1925, Turley, Wear, and Brinker signed a promissory note for $1,890, payable to appellee bank. Wear died, and the bank sued Turley and Brinker on the note. Turley did not defend. Brinker set up two defenses: (1) That he was only an accommodation maker for the payee bank; and (2) that he was a surety on the note, and the bank had without his consent granted Turley several binding extensions of the due date of the debt. The judgment was upon a directed verdict in favor of the bank for the full amount of the note against Turley and Brinker. The latter has appealed.

The only evidence adduced by the bank was the note. Brinker and Turley gave testimony in support of the latter's defenses, which viewed most strongly in Brinker's behalf will support the following fact findings:

Brinker and Wear had a mercantile business at Cleveland, Okl., and Brinker negotiated a sale of his interest to Turley for $2,500. Turley did not have the money, and he applied to the bank for a loan, which, according to Turley's testimony, the bank agreed to make upon a note signed by Turley and Wear. The president of the bank asked Brinker also to sign the note, which he finally did; and the proceeds were credited to Turley, and paid to Brinker in consummation of the trade. This note was executed in 1920, and was due six months after date. There were several renewals brought about in the following manner: A renewal note was delivered to Turley, who in turn secured the signatures of Wear and Brinker, delivered the renewal note to the bank, and took up the old note. The March 1, 1923, note had the following stipulation: "The sureties, endorsers and grantors of this note severally waive extension of time of payment, presentment and demand for payment, protest, and notice of protest for nonpayment of this note."

When it became due, Brinker refused to renew it, but the bank accepted a renewal signed by Turley alone, retaining, however, the March 1, 1923, note. There were several subsequent renewals by Turley alone as to each of which the old note was surrendered when the renewal note was delivered, but the bank never surrendered the March 1, 1923, note.

The contention that Brinker was only an accommodation maker for the bank is predicated upon the following quotations from his testimony concerning his negotiations with the bank president:

"I did not receive any money from the bank by virtue of signing this note. With reference to whether or not I received anything from anybody else for having signed my name to that note, I will say that I received some money from Clyde Turley for my interest in a stock of merchandise. That was in payment for the merchandise I sold to Turley; for a stock of merchandise I owned in Cleveland, Oklahoma. * * * At the last he (Mr. Myers, President of appellee bank) asked me that I go on the note and I told him no and then he insisted that I go on the note; then I signed my name to it. * * * I say that I had this conversation I am talking about with Mr. Myers. I think I was asked about that proposition a couple of weeks ago when my deposition was taken.

"Q. I asked you then about your going on the note and you stated at that time, didn't you, that 'I didn't feel like I should be asked to go on the note, so he said, "that's a pretty good size note," and he said he had better have some other person go on the note, and insisted that I go on it.' Now that's about what happened? A. I think that is about it.

"Q. He said, 'This is a good size note, Mr. Brinker and I want your name on it;' he knew you were a good reliable man, you had done business with him for some time? A. Yes sir. I guess he knew I was reliable; and he said this is a good size note and I want your name on it. At first I didn't want to go on it, I didn't want my name signed to a note with Mr. Turley or anybody else. I don't know about anybody else but I didn't want to go on his note because I was leaving there and leaving that part of the country and I didn't want to leave any obligations up there behind me when I left, and therefore at first I said, 'No, I didn't want to sign it.' John and I had considerable talk—at considerable length in regard to that but as to word for word, I couldn't say, but that was the substance. That is to about the same effect I testified a week or so ago when my deposition was taken. After we had talked about it I said 'all right, John, I will go on that note for Turley.' And that is a fact and I an-

swered that in my deposition. I think I signed the note after Mr. Wear had signed it and turned it over to Mr. Turley and he paid the money to me, about $2,500.00, and through this means we were able to put through this deal and I went out of business and left Cleveland. * * *"

"I wanted to get out of business and he wanted to get the business and he borrowed the money; I think he had to borrow the money from the bank in order to pay me that $2,500.00."

The following is from Turley's testimony: "It is a fact that they wanted Mr. Wear and Mr. Brinker on there so that they would know that the note was going to be paid, they didn't know about me; they knew I would be willing but didn't know whether I would be able. Mr. Brinker had been in business there for some time and was a pretty substantial business man. I don't know whether the bank felt that Mr. Brinker on there they would be safe on that note. They did not let me have the money without Mr. Brinker's signature on it. When I got the money they just gave me a checking account and I gave Mr. Brinker a check for the money due him. I disremember the exact amount that was due Mr. Brinker; I think it was $2,500.00. I do not know whether you would call it a checking account or not but they gave me an account for $2,500.00 and I turned around and wrote Mr. Brinker a check. It is a fact that I had to borrow the money and that that was the only means I had of getting the money to pay Mr. Brinker for his share of the business, to borrow the money on that note, either from that bank or some other bank; and I couldn't borrow it with my signature but had to have these other signatures on it."

With reference to appellant's defense as an accommodation maker for the bank, appellee makes two contentions: (1) That an accommodation maker must receive no consideration for his signature; And (2) that the party accommodated is the one to whom credit is lent and who is to provide for payment at maturity, who in this instance was Turley and not the bank.

In support of the first contention, appellee cites Commonwealth Nat. Bank v. Goldstein (Tex. Civ. App.) 261 S. W. 538; Exum v. Mayfield (Tex. Civ. App.) 286 S. W. 481, and 8 C. J. 252, which appear to be directly in point. However, since we are sustaining the second contention, it is unnecessary to rest our decision on the first.

The legal principles applicable to accommodation paper which control the question here may be summarized as follows:

■ An accommodation maker is one who signs an instrument without receiving value and "for the purpose of lending his name to some other person." R. S. 1925, art. 5933, § 29. "Accommodation" so employed is the loan of credit without consideration by one party to another, "who undertakes to pay the pa-per and indemnify the lender [of credit] against loss on its account," the purpose being that the party accommodated "shall obtain money or credit upon it of some third party." Greenway v. Grain Co. (C. C. A.) 85 F. 536.

■■ The fact that a party who signs a note as maker himself receives no consideration does not necessarily constitute him an accommodation maker for the payee. In legal acceptation, accommodation as applied to notes and other paper has a technical meaning and is not used in its broadest popular sense. The fact that the payee may receive benefit or be accommodated by or may solicit the signature of a party who receives no consideration therefor does not constitute such party an accommodation maker for the payee. It is only in those cases where the note is executed for the sole purpose of its negotiation by the payee in order that he may obtain credit thereby, and under an agreement that he is to provide for payment at maturity and indemnify the maker, that the instrument becomes in law accommodation paper for the payee. These principles are established by the following cases, which in their facts are, if anything, stronger than the case at bar. Magill v. McCamley (Tex. Civ. App.) 182 S. W. 22; Nalitzky v. Williams (C. C. A.) 237 F. 802; Skagit State Bank v. Moody, 86 Wash. 286, 150 P. 425, L. R. A. 1916A, 1215; German American State Bank v. Watson, 99 Kan. 686, 163 P. 637.

■ It is clear from these authorities, if authority were necessary, that Brinker under the above evidence was not an accommodation maker for the bank, and this defense is unavailing.

■■ The second defense, that of release from liability by virtue of extending the due date without Brinker's consent, is predicated upon the following construction appellant gives to the above-quoted stipulation of the note: The language, "waives extension of time of payment," means "that the surety would not request or insist that the holder of the note should grant an extension of the time of payment thereof." It is argued that waiver of extension of time of payment cannot be construed as an agreement that such extension might be made. The rule of strictissimi juris in the construction of surety agreements is invoked. Conceding the force of that rule, we are unable to concur in this construction of the language used. The surety has no right to demand an extension of the time of payment, and therefore this interpretation would render the provision meaningless. Any one however bound by obligation has in a sense a right to request a postponement or extension of its due date, just as any one has the right to request another to do any other act. But where compliance with such request is merely optional, there would be no purpose in making an agreement that the request would not be made. Such agree-

ment could not be enforced, nor could the violation of it create any legal right. The surety has a very definite right to maintain the due date of instruments he signs, and an extension of time of payment without his consent operates as a release. He can waive that right in advance; and, if the clause in question does not mean that he did so waive, we can conceive of no reasonable meaning to give it. The only other construction which appellant has suggested is that above stated, which we find to be untenable.

The trial court's judgment is affirmed.

Affirmed..